UNITED STATES of America, Appellee,

v.

Arthur SUTTON, Defendant, Appellant.

No. 91–1536.

United States Court of Appeals,
First Circuit.

Heard June 3, 1992.

Decided Aug. 3, 1992.

---

1002

Brian J. McMenimen, with whom Boudreau, Burke & McMenimen was on brief, for defendant, appellant.

Paul G. Levenson, Asst. U.S. Atty., with whom A. John Pappalardo, Acting U.S. Atty., was on brief, for U.S.

Before SELYA, Circuit Judge, LAY,* Senior Circuit Judge, and PIERAS,** District Judge.

---

* Of the Eighth Circuit, sitting by designation.
** Of the District of Puerto Rico, sitting by designation.

SELYA, Circuit Judge.

Defendant-appellant Arthur Sutton and a codefendant, James T. Cornwell, were indicted by a federal grand jury and charged with various counts of mail and wire fraud. *See* 18 U.S.C. §§ 1341, 1343 (1988 & Supp. II 1991). According to the indictment, the charges arose out of "a scheme and artifice to defraud investors by means of a fraudulent real estate venture." Cornwell pleaded guilty. Sutton stood trial. The district court dismissed the wire-fraud counts on a technicality (the government having bollixed the dates of relevant events in the charging papers). After considering the four mail-fraud counts, the jury found appellant guilty on three of them.

Appellant's main point on appeal involves the trial judge's decision to allow the jury some freedom to participate in the examination of witnesses during the trial. Although we think that this practice may frequently court unnecessary trouble, we find no error in the circumstances of this case. Because we conclude that Sutton's other ground of appeal is also bootless, we affirm the judgment below.

## I.

### *Juror Participation in the Questioning of Witnesses*

The issues raised on this appeal do not require an exegetic account of the evidence. Thus, in approaching appellant's principal contention, we begin by focusing the lens of our inquiry on what transpired in connection with the judge's adventurous enlargement of the jury's traditional role. Next, we review the applicable law. Finally, we tackle the underlying issue.

### A.

### *What Transpired*

After the jury was sworn, Judge Young gave some preliminary instructions. In the course of those instructions, he stated:

You can take notes.... You can ask questions. If you want to ask a question, you just rip a page out of your notebook, write your question on the page, pass it ... to the foreman, who will give it to the clerk, who will give it to me. I'm a lawyer, I'll read it. If your question even possibly could make any legal difference in the case, if it's relevant as the lawyers say, I'll ask it for you. Indeed, I'll ask some other questions to follow up, to find out what this witness has to say about what it is that you're concerned about.... If I don't think that your question could make any legal difference, it doesn't mean it was wrong of you to ask it, you can't go wrong by asking a question, I simply won't ask it. Don't you take that as some reflection on you. It's not at all. I just don't think legally it makes any difference. But what I do is put the question out on the table here where the lawyers can look at it. And they may think of a way to get at the issue. At least they'll know what's on your mind[s], which may be helpful to them in the proper presentation of the case.

No objections were lodged to this portion of the precharge. The trial began.

The first significant mention of a juror question occurred on February 25, 1991 (the fourth day of trial). During the direct examination of a disappointed investor, Stephen Ginsburg, Judge Young responded in open court to a note inquiring about the jury's right to question witnesses:

Here's a good question ..., and it's addressed to me ..., from a juror: May we submit questions to be addressed to witnesses while the witness is on the stand?

Yes. That really is the essence of your right to ask questions. You can ask questions of me. You can ask questions of me about the law, but I really can't ask a question on your behalf about the evidence, unless a witness who could answer that question is on the witness stand. I can't just launch off, you see, asking questions. And so your right to ask questions, your right to use me as, as I am still a lawyer, and hope I still know how to ask questions as a lawyer, to ask questions of the witnesses.... But really, the essence of your right to ask questions is that right to question

these witnesses. It's just that you have to question them through written questions, because that's an orderly and a fair way to do it, lest we get some question that's off the mark. So, of course, you have the right at any time to ask a question of any witness, and really, you should pass the question up while I've still got the witness on the stand.

No one voiced an objection to the judge's response.

Later that same day, Judge Young asked Ginsburg a series of questions prompted by a juror's note. The queries were directed to when Ginsburg had last seen Sutton ("about three months ago") and the nature of their relationship at that time ("strained"). After the witness vouchsafed these answers, defense counsel approached the bench. A colloquy ensued:

> [DEFENSE COUNSEL]: I want to object to the Court having posed the question, the questions asked by the juror. . . . I think I probably would have had an objection as to relevancy. I'm kind of frightened to object to a question asked by a juror lest they misconstrue and ascribe an improper motive to it, and I would only ask if the Court would consider conferring with counsel before putting questions.
>
> THE COURT: Well, if I think there's any doubt about it, I will confer with counsel. . . .

Defense counsel expressed no dissatisfaction with the trial court's rejoinder. The court resumed its line of inquiry, asking when Ginsburg learned that Cornwell had falsified certain documents.[1] Counsel thereupon renewed the objection and moved for a mistrial. He hypothesized in an entirely conclusory fashion that the court's interjection "could affect . . . how I'm going to present my defense" and might, therefore, "be troublesome for me." Judge Young overruled the objection and refused to declare a mistrial.

1. Appellant conceded that the documents in question were not only forged but also germane to the real estate venture.

2. Two of these incidents transpired in the course of defense counsel's cross-examination of

The next relevant vignette occurred on February 26. During the defense's cross-examination of a prosecution witness, Philip Capello, Judge Young received a written question from a juror. He posed it to Capello, along with a series of follow-up questions. No objections were recorded. Some time later, Judge Young directed another set of juror-inspired questions at Capello. These questions dealt with when Capello had last seen Sutton ("probably the summer [of 1989]") and the nature of their relationship at that time ("still cordial"). After these answers had been recorded, defense counsel asked to be heard and lodged a general objection at sidebar:

> [DEFENSE COUNSEL]: I would object to some of those questions that the Court put to . . . the witness on behalf of the jurors. I think if [the prosecutor] or I had asked some of them and there had been objection, that it would have been excluded.
>
> THE COURT: Why didn't you object to my asking it?
>
> [DEFENSE COUNSEL]: Because it's a question from a juror, your Honor, being asked by the Court.

At three more points during the trial, jurors asked Judge Young to direct questions to a witness.[2] Judge Young obliged. Defense counsel did not object on any of these occasions.

## B.

### Applicable Legal Principles

The appellant asserts that the questioning of witnesses by jurors in a criminal trial is inherently prejudicial, invades counsel's province, distorts the roles of judge and jury, and unfairly inhibits objections. Accordingly, he urges us to ban the practice outright and, in the bargain, vacate his conviction.

Saul Komessar and Donald Palmer, respectively. The third, and final, incident occurred on March 1, 1991, while Sutton was testifying on redirect.

■ We do not treat this exhortation lightly. Allowing jurors to pose questions during a criminal trial is a procedure fraught with perils. In most cases, the game will not be worth the candle. Nevertheless, we are fully committed to the principle that trial judges should be given wide latitude to manage trials. We are, moreover, supportive of reasoned efforts by the trial bench to improve the truth-seeking attributes of the jury system. Consistent with this overall approach, and mindful that the practice of allowing jurors to participate in the interrogation of witnesses may occasionally be advantageous, especially in complex cases and under carefully controlled conditions, we hold that allowing juror-inspired questions in a criminal case is not prejudicial *per se*, but is a matter committed to the sound discretion of the trial court. *Accord United States v. Lewin*, 900 F.2d 145, 147 (8th Cir.1990); *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir.1986); *United States v. Callahan*, 588 F.2d 1078, 1086 (5th Cir.), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *United States v. Gonzales*, 424 F.2d 1055, 1056 (9th Cir.1970) (per curiam); *United States v. Witt*, 215 F.2d 580, 584 (2d Cir.), *cert. denied*, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954); *see generally United States v. Nivica*, 887 F.2d 1110, 1123 & n. 9 (1st Cir.1989) (discussing practice), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990).

■ We hasten to add that the practice, while not forbidden, should be employed sparingly and with great circumspection. The dynamics of a criminal trial are extremely sensitive. Innovations that carry the potential for disrupting those dynamics are risky. Juror participation in the examination of witnesses represents a significant innovation, transforming the jurors' role from a purely passive one to a partially interactive one. The practice also delays the pace of trial, creates a certain awkwardness for lawyers wishing to object to juror-inspired questions, and runs a risk of undermining litigation strategies. We suspect that, in most situations, the risks inherent in the practice will outweigh its utility.[3] Thus, juror participation in the examination of witnesses should be the long-odds exception, not the rule. *Cf., e.g., Nivica*, 887 F.2d at 1123 (citing *DeBenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512, 516 (4th Cir.1985)). We will judge the trial court's affirmative exercise of its discretion under the totality of the circumstances in each case.

■ We think it follows that trial courts should rarely employ the praxis. Moreover, a judge who decides to utilize it should take pains to lessen its inherent dangers by implementing a series of prophylactic measures. While we decline to impose a rigid format upon the trial bench, we suggest that, if jurors are to be allowed to. participate in the interrogation of witnesses in a criminal case, counsel should be alerted to the court's intention at the earliest practicable time and given an opportunity to be heard in opposition to the practice. If the court elects to proceed, the jury should be instructed that questions are to be reserved for important points, that the rules of evidence may frequently require the judge to eschew certain questions, and that no implication should be drawn if a juror-inspired question withers on the vine. The judge should also include a prophylactic instruction in his final charge to the jury.

■ Actually handling jurors' questions requires an equally deft touch. Jurors should not be permitted to blurt out queries in the midst of trial. Rather, a screening mechanism should be set in place. To that end, we recommend that jurors be instructed to reduce their questions to writing and pass them to the judge. When such questions eventuate, the judge should ordinarily call counsel to sidebar, relate the

---

3. To be sure, the balance is not completely one-sided. Juror-inspired questions may serve to advance the search for truth by alleviating uncertainties in the jurors' minds, clearing up confusion, or alerting the attorneys to points that bear further elaboration. Furthermore, it is at least arguable that a question-asking juror will be a more attentive juror.

particulars, and rule on any objections.[4]

## C.

### Analysis

■ In the circumstances of this case, we discern no reversible error stemming from the interrogation of various witnesses. At least four factors bolster this conclusion.

■ First, the appellant effectively acquiesced in the process. When the court announced during its precharge that it would permit juror-inspired questions to be posed, and thereafter, when the court reiterated the protocol in response to a juror's inquiry, see supra pp. 3–4, appellant neither objected nor requested any additional safeguards. When a trial judge announces a proposed course of action which a party believes to be erroneous, that party must act expeditiously to call the perceived error to the judge's attention, on pain of forfeiting the right subsequently to complain. See, e.g., Reilly v. United States, 863 F.2d 149, 160 (1st Cir.1988); Austin v. Unarco Indus., Inc., 705 F.2d 1, 15 (1st Cir.), cert. dismissed, 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983). Here, appellant's acquiescence constituted a waiver as to the court's use of the procedure.

Second, the alleged scheme to defraud involved a considerable degree of sophistication. Because this was a factually complex case in which a greater-than-average risk of jury confusion existed, the positive value of allowing juror-inspired questioning was relatively high. See generally Sand & Reiss, A Report on Seven Experiments Conducted by District Court Judges in the Second Circuit, 60 N.Y.U.L.Rev. 423, 444 (1985) (discussing participating judges' "general perception that [authorizing] juror questioning of witnesses would be most useful in complex cases").

Third, the district court adopted suitable procedural safeguards. Rather than allowing the jurors to question witnesses directly, a method which has been disapproved in this circuit, see Nivica, 887 F.2d at 1123, the judge required the jurors to reduce their questions to writing and filter them through the court. Judge Young also explained in advance that he might not propound the questions the jurors suggested and accepted the onus for such an eventuality. Appellant's objections were heard at sidebar, out of the jury's earshot.[5] The judge's follow-up questions were invariably discreet. In our view, this panoply of prophylactic measures greatly reduced any possibility of unfair prejudice.

Fourth, the questions themselves were few in number and bland in character.[6] Appellant did not object to most of them. In the few instances when appellant objected, the objections were jejune. The principal objection was on relevancy grounds. But, "district courts have broad discretion as to discerning the relevancy vel non of evidence," United States v. Tierney, 760

---

**4.** Of course, once a juror-inspired question is posed to a witness, the judge may ask proper follow-up questions of his own volition. See Fed.R.Evid. 614(b) (authorizing trial judge to interrogate witnesses); see also United States v. Olmstead, 832 F.2d 642, 648 (1st Cir.1987) (discussing extent of district court's discretion to question a witness in a criminal jury trial), cert. denied, 486 U.S. 1009, 108 S.Ct. 1739, 100 L.Ed.2d 202 (1988). Such follow-up questions will be subject to objection in the same manner, and to the same extent, as other questions posed independently by the judge.

**5.** We are unimpressed with Sutton's claim that the chink in the armor of the district court's prophylaxis lay in the court's failure to allow counsel the opportunity to screen juror-inspired questions prior to the court's asking those questions. While pre-screening by counsel would

have been preferable, appellant failed to register an objection when the judge stated that he would utilize pre-screening only if he had some doubt about the validity of a proposed question. See supra Part I(A). In this case, moreover, pre-screening could not conceivably have made a difference, since the district court ultimately overruled all of appellant's objections to particular queries.

**6.** We are keenly aware that, in a criminal case, juror-inspired questioning becomes particularly troublesome when questions are directed at the defendant. See United States v. Johnson, 892 F.2d 707, 711–13 (8th Cir.1989) (Lay, C.J., concurring). In general, we disapprove of that practice. Here, however, only one such question was posed; appellant did not object to it; and he has not argued on appeal that this specific question was improper or harmful.

F.2d 382, 387 (1st Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985), and it strains credulity to argue that the perimeters of this discretion were exceeded here. Sutton's other ground of objection involved the naked claim that the questioning might adversely affect the defense's trial strategy. Yet, appellant never explained to the trial court—or to us—how or why this was so.[7]

In any event, neither the questions nor the responses struck close to the jugular. In all, the record demonstrates beyond hope of contradiction that the juror-inspired questioning was innocuous and did not compromise the trial's fairness. The assignment of error must, therefore, fail. *See, e.g., Lewin,* 900 F.2d at 148 (upholding district court's allowance of juror-inspired questions where the questioning was not "allowed to become disruptive or abusive"); *Callahan,* 588 F.2d at 1086.

## II.

### Evidence of Subsequent Events

The mail-fraud counts charged appellant with performing specific acts, in furtherance of the scheme to defraud, at various times in July and August 1987. Appellant contends that the court below erred when it allowed, over objection, the testimony of (1) Robert Malesardi, a prospective investor, to the effect that appellant tried repeatedly to recruit him in the summer of 1988 (well after appellant was on unambiguous notice of Cornwell's forgeries); (2) Joan Muse, a disgruntled investor, regarding her telephone conversations with appellant in Sep-

tember, 1988 (after she learned of the fraud); and (3) Saul Komessar, *see supra* note 2, anent his dealings with appellant throughout 1988. Sutton says that this testimony was irrelevant to the cardinal issue in the case—whether or not he possessed the requisite criminal intent *in the summer of 1987*—and that, even if relevant, the evidence's unfairly prejudicial effect substantially outweighed its probative value.[8] We do not agree with either proposition.

### A.

### Relevancy

■ We need not tarry in these precincts. Appellant's main line of defense involved an asserted lack of scienter: he said, in effect, that he, too, was an unwitting victim of Cornwell's fabrications. We believe that the challenged testimony, though it centered around later-occurring events, was relevant to show appellant's intent at an earlier date; and that, therefore, the district court did not commit an abuse of discretion in permitting the testimony to be introduced.

We think it is an accepted proposition, logically and legally, that subsequent events may shed light upon, and be relevant in determining, what transpired at an earlier time. *See, e.g., Foley v. Lowell,* 948 F.2d 10, 14 (1st Cir.1991); *United States v. Mena,* 933 F.2d 19, 25 & n. 5 (1st Cir.1991); *Bordanaro v. McLeod,* 871 F.2d 1151, 1157 (1st Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989); *Tierney,* 760 F.2d at 387–89; *United States v. Mc-*

---

7. Appellant's claim that the court erred in permitting juror-inspired questioning of Philip Capello because that line of inquiry implicated events occurring after January of 1988 necessarily falters for the reasons discussed in Part II, *infra.*

8. Appellant also argues that admitting the challenged evidence worked a fatal variance or constructive amendment of the indictment vis-a-vis the mail-fraud counts. This argument is sheer persiflage. For one thing, appellant identifies no prejudice to his substantial rights in connection with any asserted variance and the record reflects none. Hence, a claim of error will not lie. *See United States v. Fermin Castillo,* 829 F.2d 1194, 1196–97 (1st Cir.1987); *United States*

*v. George,* 752 F.2d 749, 753–54 (1st Cir.1985). For another thing, the indictment fully apprised Sutton of the crimes with which he was charged; the proof at trial was relevant to, and within the scope of, those crimes, thus mirroring the allegations of the indictment and defusing any cognizable claim of a constructive amendment; and the district court's meticulous instructions ensured that Sutton was not convicted of some other (uncharged) crime. No more was exigible. *See, e.g., United States v. Medina,* 761 F.2d 12, 16 (1st Cir.1985); *United States v. Kelly,* 722 F.2d 873, 876 (1st Cir.1983), *cert. denied,* 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984).

*Donald,* 576 F.2d 1350, 1356 (9th Cir.), *cert. denied,* 439 U.S. 830, 927, 99 S.Ct. 105, 312, 58 L.Ed.2d 124, 320 (1978); *United States v. Wright,* 573 F.2d 681, 683 (1st Cir.), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978). In this instance, proof of Sutton's state of mind—his specific intent—was a required element of the charged offenses. Appellant's continued promotion of the investment scheme after acquiring certain knowledge that the documents on which the plan rested were forged could plausibly be viewed by a rational factfinder as bespeaking complicity and guilty knowledge from the start. *See Nivica,* 887 F.2d at 1114; *United States v. Krowen,* 809 F.2d 144, 147–48 (1st Cir. 1987); *cf. United States v. Cintolo,* 818 F.2d 980, 989–91 (1st Cir.) (a defendant's intent can be inferred from his conduct, seen in light of all the surrounding circumstances), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987). Evidence of appellant's words and deeds during the later period was, therefore, relevant.

## B.

### *Probative Worth/Prejudicial Impact*

■ Appellant also argues that, even if relevant, the evidence should have been excluded on grounds of undue prejudice. The Evidence Rules authorize a trial judge to bar the introduction of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or [certain other considerations]." Fed.R.Evid. 403. The trial judge's discretion in calibrating the Rule 403 scales is very broad. *See, e.g. United States v. Rodriguez-Estrada,* 877 F.2d 153, 156 (1st Cir.1989); *United States v. Ingraham,* 832 F.2d 229, 231 (1st Cir. 1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *Tierney,* 760 F.2d at 387. "Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the ... weighing of probative value and unfair effect." *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1340 (1st Cir.1988).

We are unconvinced that this is the rare case in which we should attempt to refigure the trial court's assessment of the probative worth/prejudicial impact calculus. To be sure, the evidence of subsequent activities played into the prosecution's theory of the case. But, that was the point of offering the testimony. By design, "all evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided." *Rodrigeuz-Estrada,* 877 F.2d at 156. Mindful, as we are, that the trial court "is more directly familiar than a court of appeals with the need for the evidence and its likely effect on the jury," *United States v. Lau,* 828 F.2d 871, 874 (1st Cir.1987), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 194 (1988), and mindful, too, that one of the few reliable means of ascertaining an actor's mental state is by drawing reasonable inferences from his comments and conduct, we decline to take the highly unusual step of second-guessing the trial judge's determination under Rule 403.

## III.

### *Conclusion*

We need go no further. We conclude that in the circumstances of this case the lower court's use of a small number of juror-inspired questions, under carefully controlled conditions, did not impinge upon the defendant's substantial rights or tarnish the fundamental fairness of his trial. We also conclude that the evidence of subsequent events was properly admitted to prove appellant's knowledge and intent during the time frame in which he undertook the mailings described in the counts of conviction.

*Affirmed.*